## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| **TRAVIS KARR** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **AMERICAN MULTI-CINEMA, INC.** ) | **Case No:** |
| ) | |
| **and** ) | |
| ) | |
| **SEDGWICK CLAIMS** ) | |
| **MANAGEMENT SERVICES, INC.** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

COMES NOW Plaintiff, Travis Karr, by and through his undersigned counsel, and files the following Complaint against Defendants American-Multi Cinema, Inc. (hereinafter "AMC") and Sedgwick Claims Management Services, Inc. (hereinafter "Sedgwick") (hereinafter collectively "Defendants"):

## I.  PARTIES

1.      Plaintiff is a citizen of the state of Missouri. He submits himself to the jurisdiction of this Court.

2.      Defendant American Multi-Cinema, Inc. is registered in the state of Kansas, operates in Kansas, and can be served at its registered agent Corporate Creations Network, Inc., 4601 E. Douglas Avenue, #700, Wichita, Kansas 67218.

3.      Defendant Sedgwick Claims Management Services, Inc. is registered in the state of Kansas, operates in Kansas and can be served at its registered agent

Corporation Service Company, 2900 SW Wanamaker Drive, Suite 204, Topeka, Kansas 66614.

## II. VENUE AND JURISDICTION

4.      The jurisdiction of the Federal Court is invoked because Plaintiff's claims arise under the statutes and laws of the United States, namely the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. § 12112 et seq., and the Family Medical Leave Act ("FMLA") pursuant to 29 U.S.C. § 2601, et seq. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper because the alleged violations of the law occurred in this district.

## III. FACTS

6.      Mr. Karr has several diagnosed conditions which effect one or more of his major life activities, which include heart and brain function.

7.      Specifically, Mr. Karr has the conditions: Autism, Bipolar Disorder, Post Traumatic Stress Disorder, Anxiety-Panic disorder and Cardiomyopathy.

8.      Despite these disabilities, Mr. Karr has been able to work successfully when unnecessary job-related stress can be avoided.

9.      Mr. Karr began his employment at AMC as a temporary employee and was eventually hired on as a regular status employee with AMC as a Desktop Service Administrator.

10.     When he was hired by AMC, Mr. Karr self-disclosed his various disabilities on his new hire paperwork.

11.     Mr. Karr was one of three employees who had the responsibility of serving as a Desktop Service Administrator for AMC at its headquarters in Leawood, Kansas.

12.     The Desktop Service Administrators for AMC served to assist much of its global operations with computer related issues.

13.     Mr. Karr provided assistance on hundreds of desktop issues during the time he worked as a Desktop Service Administrator.

14.     Between January 1, 2017 and August 1, 2018, AMC's operations and business expanded as did the number of individuals relying on AMC's Desktop Service Administrators located in Leawood, Kansas.

15.     In the Spring of 2017, Mr. Karr approached AMC Human Resources Director, Mike Oliva, to discuss difficulties he was experiencing at work due to his diagnosed disabilities.

16.     Mr. Karr again disclosed the disabilities he lived with and explained that he needed accommodations to ensure unnecessary job stress was avoided so that he did not suffer adverse manifestations of his disabilities, which he specifically identified to Oliva.

17.     As part of that disclosure, Mr. Karr explained he felt he was being mistreated at work by his coworker, fellow Desktop Service Administrator, Aaron Zahner.

18.     Aaron Zahner is a long-time employee of AMC and also a friend of the supervisor over the Desktop Service Administrators, Greg Wyman.

19.     During Mr. Karr's meeting with Oliva, Mr. Karr explained that he needed accommodations to ensure unnecessary job stress was avoided so that he did not suffer manifestations of his conditions.

20.     Mr. Karr expressed that Zahner's mistreatment of him was causing unnecessary and avoidable work-stress in light of Mr. Karr's disabilities and also discussed his need for taking a scheduled lunch each day to help him manage his stress levels.

21.     Mr. Karr also expressed that his manager, Wyman, did not take seriously Mr. Karr's complaints to him (Wyman) about Zahner.

22.     As a result of this meeting, Mr. Karr was advised that the issues he presented were more or less HR issues and he was thereby dissuaded from pursuing his issues in the form of a formal request for accommodations.

23.     Mr. Karr then met with his supervisor Wyman and Oliva to discuss his disabilities and the accommodations he needed regarding stress management.

24.     As a result of the meeting, a written plan was put in place to address Mr. Karr's concerns (hereafter "accommodation plan").

25.     After Mr. Karr's Spring 2017 complaint to Director Oliva, Zahner began emailing Mr. Karr work assignments.

26.     Despite Mr. Karr's complaints, Zahner continued to treat Mr. Karr disrespectfully and Mr. Karr continued to report Zahner's conduct to Oliva and Wyman.

27.     Zahner sent Mr. Karr emails which Mr. Karr reported as being of a disrespectful nature.

28.     However, AMC determined that Zahner was not mistreating Mr. Karr and determined Zahner was acting in a manner consistent with AMC's policies.

29.     During all relevant times, Zahner, though he was assigned as a desktop support employee, was frequently away from the desktop support desk and assisting with event planning that was unrelated to desktop support duties.

30.     The event planning activities were of a nature that they could have been assigned to AMC employees other than Desktop Service Administrators.

31.     During 2017 AMC began a process of swapping out all laptops companywide to upgrade to a new Windows operating system.

32.     AMC wrote a disciplinary action against Mr. Karr dated August 2017 for telling an employee – who was allegedly unhappy with a delay as to when his/her laptop was swapped – to talk to his (Karr's) manager about his/her concerns.

33.     The same August 2017 write-up advised Mr. Karr that though Mr. Karr may not have "intended" to be "rude" or "condescending", some other employees had "perceived" him as rude or condescending.

34.     Mr. Karr received a performance appraisal in February 2018, which rated him as meeting expectations in 11 out of 12 categories available.

35.     Mr. Karr's self-evaluation reflected his belief that he met his job expectations in 12 out of 12 categories.

36.     The category Wyman rated Mr. Karr as being below expectations was a category that stated that survey results from five departments within AMC would be used to rate Mr. Karr's effectiveness in his ability to respond to desktop issues.

37.     Without setting forth the survey results or otherwise providing information about such survey results, Wyman explained that he nevertheless rated Mr. Karr as below expectations in this category because of the August 2017 writeup.

38.     On information and belief, Wyman did not utilize the survey information as set forth in the evaluation to appraise the performance of Mr. Karr.

39.     That is, rather than use the objective measure of customer satisfaction called for, Wyman used a different and less objective measure to determine Mr. Karr did not meet expectations in that category.

40.     Wyman then proceeded to rate Mr. Karr's overall performance for 2017 as "Does Not Meet Expectations".

41.     Wyman scrutinized Mr. Karr's work more harshly than the work performed by Wyman's other direct reports when he gave Mr. Karr his performance evaluation rating.

42.     Mr. Karr complained to AMC's human resources about the "Does Not Meet Expectations" review and as part of that, the accommodation plan was reviewed.

43.     As part of this review of Mr. Karr's accommodation plan, Wyman admitted the plan had not been complied with.

44.     Nothing improved as a result of Mr. Karr's complaints and instead steps were being taken to make Mr. Karr's environment more stressful.

45.     In addition to the event planning project work that Zahner was frequently called to perform, similar special assignments were given to the other Desktop Service Administrator, John Sutherland.

46.     As a result of the special assignments given to Sutherland and Zahner, Mr. Karr became increasingly responsible to address even more desktop service requests arising from AMC's fast-growing business.

47.     As a result, Mr. Karr voiced his concerns – including concerns about harms occurring as to his health – about the unnecessarily increased workload and he tried to follow-up on compliance with the accommodation plan, but Wyman ignored Mr. Karr's concerns.

48.     On about August 1, 2018, Mr. Karr was advised that he had sent an alleged inappropriate email criticizing Greg Wyman to a third party within AMC.

49.     Also on August 1, 2018, Wyman called Mr. Karr into an office and admonished him on multiple issues, including the alleged offensive email as well as alleged customer complaints and other alleged work performance issues.

50.     Mr. Karr responded candidly that he had been overwhelmed, had been having difficulty concentrating, and that his mental health professional had advised him to take extra time off work.

51.     Mr. Karr explained that, because of his mental health professional's suggestions to take time off, he had been taking days off recently.

52.     Mr. Karr explained to Wyman that he needed to take disability leave so he could get his mental health issues and their ramifications back under control.

53.     When the meeting with Wyman was over, Mr. Karr returned to work, but took the next two days off work as directed by his mental health professional.

54.     Mr. Karr called-in on Thursday, August 2, 2018 and spoke to Wyman to report his absence.

55.     During the August 2, 2018 call, Mr. Karr reiterated what he told Wyman during the meeting on Wednesday and mentioned that he read the employee handbook as directing him to let Wyman or Human Resources know of his intentions to take FMLA medical leave to address health issues.

56.     Mr. Karr told Wyman his mental health professional told him to take both Thursday and Friday off work.

57.     Mr. Karr asked if a doctor's note was needed and Wyman said no.

58.     The next day, Mr. Karr called AMC's Human Resources Department and told them he needed to submit an FMLA disability leave request.

59.     In response, Mr. Karr was advised to make the request through AMC's third-party administrator, Defendant Sedgwick, at AMC using AMC's intranet.

60.     Based on that direction, on Monday, August 6, 2018, Mr. Karr arrived to the AMC office in Leawood.

61.     Mr. Karr, while on AMC property, filled out and submitted an online leave request to Sedgwick using AMC's intranet.

62.     Mr. Karr's leave request generated both a request for medical leave and a request for short-term disability benefits.

63.     Mr. Karr logged in to the AMC intranet to file his claim with Sedgwick.

64.     After submitting the leave request and receiving a notice that his request had been processed, Mr. Karr then proceeded to do some work for several hours while at AMC's office in Leawood.

65.     Mr. Karr intended to leave work after completing a few lingering work tasks to commence with the leave of absence he requested.

66.     Later that morning, Wyman summoned Mr. Karr to a meeting.

67.     Mr. Karr and Wyman went to a conference room where Oliva was already waiting for him.

68.     At the meeting, Mr. Karr was presented with alleged performance deficiencies including the email which Wyman had discussed in their August 1 meeting.

69.     Mr. Karr was then told he was being terminated from employment and was handed a "Release Agreement" which would waive all his legal claims.

70.     The Release Agreement stated his last day worked was August 6 and his termination date was August 9.

71.     Mr. Karr protested the decision and Oliva claimed to relent and said instead that Mr. Karr was going to be put on a suspension instead while he looked into matters further.

72.     Oliva asked for Mr. Karr's badge and walked him out the building.

73.     Not long after leaving the AMC building, Mr. Karr received a phone call from Oliva and was informed that the termination decision was now final.

74.     As of the time he was terminated, Mr. Karr was not under a current written performance warning and had not been placed on a performance improvement plan.

75.     As of the time Mr. Karr was terminated, Wyman had ignored the accommodation plan put in place as to Mr. Karr's known disabilities.

76.     AMC cut off Mr. Karr's health insurance benefits which meant he was unable to receive medical treatment he intended to receive and had been receiving for his disabilities.

77.     Later on August 6th, 2018 Mr. Karr called Sedgwick to check on his leave application.

78.     The Sedgwick representative noted that some of the documentation in Mr. Karr's electronic record showed his application for disability leave had caused it to be placed in "denied" status.

79.     The representative also noted that the electronic claim history also showed Mr. Karr's "hire" date had been altered to show he had not been employed for a full year by AMC which caused his FMLA application to be cancelled, but that

the history field in Mr. Karr's record also showed his employment date was changed back to the correct date of hire which renewed consideration of his FMLA claim.

80.     The Sedgwick agent noted that both AMC and the Sedgwick's AMC account representatives had been involved in the data changes.

81.     The Sedgwick agent said she would need to have another employee take a look at the transactions and advised Mr. Karr to call back the next day.

82.     The next day, August 7, Mr. Karr made the follow-up phone call to Sedgwick and was directed to talk to an agent named "Kevin" for whom he left a voice message.

83.     The next day Sedgwick employee Colleen O'Brien called Mr. Karr and told him she had been informed by AMC that he filed for disability leave after being terminated, and that AMC requested all Mr. Karr's applications for leave be cancelled.

84.     O'Brien then concluded the call directing Mr. Karr to address any further questions to AMC and not Sedgwick.

85.     Mr. Karr then followed-up with Oliva who advised Mr. Karr as O'Brien had, that is, that Mr. Karr's disability and FMLA applications were made after he was terminated.

86.     Mr. Karr objected because he put the application in on August 6, 2018 while at AMC's offices and before being told of his suspension or termination.

87.     Oliva responded by directing Mr. Karr to the AMC benefits department and said this issue was not one he could help Mr. Karr with.

88.     Mr. Karr proceeded to make calls to AMC's benefits department employees about the problems he was having as a result of the manipulations in his leave application, but after talking to multiple different agents on different days with no solutions, Mr. Karr was told by an agent that he had been terminated and had no right to receive the leave benefits.

89.     Mr. Karr then created an account in Sedgwick's online website so he could view his claims but saw that his claims for disability and FMLA leave were "terminated".

90.     A few days later, Mr. Karr logged back in for more information, but after searching for his case numbers, he could only find his FMLA claim but his disability leave claim could not be located by searching for a case number.

91.     On August 24, 2018 Mr. Karr received a call from Sedgwick representative Colleen O'Brien.

92.     O'Brien told Mr. Karr that she was calling to "reinforce" to him that he submitted his claim for FMLA and disability leave after he was already terminated and his leave applications was therefore denied.

93.     Despite O'Brien's claims and despite the information in his online records with Sedgwick, Karr's request for short-term disability was not finally and formally denied until February 8, 2019. A true and accurate copy of Mr. Karr's denial letter is attached as **Exhibit A**.

94.     According to the applicable short-term disability plan, denial letters are required to be issued forty-five (45) days after an associate's (in this case, Mr. Karr)

application for short-term disability benefits is received by Sedgwick. A true and accurate copy of AMC's Short-Term Disability Policy is attached as **Exhibit B**.

95.     The formal denial, and its accompanying (and required) denial letter came more than 55 days *after* the contractual deadline provided for Sedgwick to issue a denial letter as to short-term disability requests.

96.     That is, it was more than 100 days from the time of Mr. Karr's application for short-term disability benefits that Sedgwick issued the required denial letter.

97.     According to Sedgwick, Mr. Karr was denied his short-term disability benefits because he applied for such benefits *after* his employment had been terminated.

98.     Mr. Karr appealed Sedgwick's denial by arguing that he applied for his short-term disability benefits *before* he was told he had been terminated.

99.     During the course of his appeal, Mr. Karr was advised that the appeal process had confirmed that his termination date from AMC came after the date he applied for short-term disability benefits.

100.     But then, on June 3, 2019, Sedgwick proceeded to issue a new denial letter setting forth the reason for denying Mr. Karr's short-term disability benefits as being because he was not "absent from work long enough to meet the 14 day waiting period." A true and accurate copy of the June 3, 2019 letter is attached as **Exhibit C**.

101.    That is, because AMC fired Mr. Karr within 14 days of when he submitted his application for short term disability benefits, he lost his eligibility to receive short-term disability benefits.

102.    In other words, AMC's short-term disability policy provides that as long as an AMC associate is terminated within fourteen days of his/her application for short-term disability benefits, then the employee can't receive his/her short-term disability benefits.

103.    This new reason for denial came more than 180 days after the contractual deadline in place for Sedgwick to issue denial letters when denying applications for short-term disability leave.

104.    On June 27, 2019, Sedgwick's denial of Mr. Karr's short-term disability benefits was then affirmed by Sedgwick based on the denial letter issued on June 3, 2019. A true and accurate copy of the June 27, 2019 letter is attached as **Exhibit D**.

105.    During his employment, Mr. Karr also paid into AMC's long-term disability plan.

106.    The actions of Sedgwick interfered with Mr. Karr's right to receive short-term Disability payments under the short-term disability plan it administered for AMC.

107.    Sedgwick knew of Mr. Karr's contractual rights as to the short-term disability plan he purchased from AMC and denied Mr. Karr's short term disability application in bad faith, based on crafting an illusory interpretation of the provisions of the short-term disability contract.

108. AMC is self-insured and its short-term disability plan is not subject to ERISA.

109. In approximately February 2019, Mr. Karr mailed a claim for long-term disability benefits as to his long-term disability benefits policy.

110. AMC failed or refused to process or respond to Mr. Karr's claim for long-term disability within the timeframe allotted under the long-term disability contract, and thereby breached its contract and agreement to provide long-term disability benefits to him even though he was qualified to receive such benefits.

111. The actions of Sedgwick aided and abetted AMC in its action of terminating Mr. Karr, which termination was an effort to avoid AMC's obligations under the ADA, FMLA and to otherwise make payments to Mr. Karr pursuant to its contractual obligations under its short-term disability and/or long-term disability plans.

112. The actions of Sedgwick and AMC described above also interfered with, delayed or denied Mr. Karr's ability to receive long-term disability benefits.

## IV. COUNT I
## VIOLATION OF THE FMLA AGAINST DEFENDANT AMC

113. Plaintiff hereby incorporates the foregoing paragraphs by reference.

114. The FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right pursuant to the FMLA.

115. The FMLA makes it unlawful for any employer to take action against an employee for exercising his or her rights under the FMLA.

116.    AMC is an employer within the meaning of the FMLA.

117.    Plaintiff was entitled to FMLA protected leave with respect to the conditions he disclosed to AMC during his employment and with respect to the communication he provided to AMC in the time-period of July 31, 2018 through August 6, 2018.

118.    Plaintiff disclosed sufficient information to AMC about a condition which may qualify him for an FMLA leave and thereby engaged in FMLA protected activity.

119.    Plaintiff engaged in protected activity on or about August 1, 2018 when he disclosed to his supervisor that he had been missing work due to his underlying mental health conditions and that he needed to take a medical leave of absence based on the recommendations of his mental health provider.

120.    Pursuant to 29 CFR 825.123, Plaintiff was entitled to receive notice of his FMLA rights and thereby the protection by the FMLA.

121.    AMC failed to give Plaintiff notice of his FMLA rights.

122.    AMC retaliated against Plaintiff on account of his FMLA protected activity (e.g. disclosure of a condition which may qualify for FMLA leave, and or specifically requesting FMLA leave) by suspending his employment, terminating his employment and collaborating with its Third Party Administrator, Defendant Sedgwick, to deny his FMLA benefits and otherwise give an appearance that Mr. Karr did not invoke his FMLA rights until after Mr. Karr was terminated.

123.    The denial of Mr. Karr's FMLA rights resulted in the delay of and payment for medical treatment which otherwise would have been timely, and less expensively received (i.e. as an insured individual under AMC's health insurance plan).

124.    AMC interfered with, restrained, and denied Plaintiff's exercise, and attempted exercise, of rights pursuant to the FMLA by suspending him and terminating his employment and ending his health insurance benefits coverage.

125.    Plaintiff is entitled to all damages authorized by 29 U.S.C. § 2617, including compensatory damages, make whole damages, lost wages and benefits, interest, liquidated damages, attorneys' fees, and equitable relief.

126.    AMC acted willfully and with full knowledge of its actions against Mr. Karr, entitling him to liquidated damages.

WHEREFORE, Plaintiff prays for judgment against Defendant AMC for all damages recoverable under the FMLA, including his attorneys' fees, the costs of this action, and such other and further relief as the Court may deem just and proper.

## V. COUNT II
## DISABILITY DISCRIMINATION AND RETALIATION IN VIOLATION OF THE ADAA AGAINST DEFENDANT AMC

127.    Plaintiff hereby incorporates the foregoing paragraphs by reference.

128.    Plaintiff was an individual suffering from a disability, had a record of having a disability, and/or was perceived to have a disability in the form of mental health disorders and a heart disorder (hereinafter referred to collectively as "Disability").

129.    Plaintiff was an individual qualified to perform the essential duties of a Desktop Service Administrator for AMC with or without reasonable accommodations.

130.    Plaintiff engaged in protected activity by disclosing his Disability to AMC, requested accommodations and requested time off to seek and receive medical treatment connected with his Disability.

131.    Plaintiff attempted to engage in a good faith interactive dialogue about reasonable accommodations needed as to his work responsibilities, while AMC listened, but in reality AMC failed to follow through with any reasonable accommodations as to Plaintiff's known disabilities and rather cast Plaintiff's request as an "HR issue".

132.    Plaintiff sought reasonable accommodation to deal with difficulties he had with regard to his Disability in and leading up to August 1, 2017 in the form of time off, but was instead fired rather than granted the medical leave he sought.

133.    AMC terminated Plaintiff's employment because of his Disability and/or because AMC regarded Plaintiff as disabled, and/or because Plaintiff engaged in protected activity, all in violation of the ADAA.

134.    AMC scrutinized Plaintiff's work performance more harshly that similarly situated employees and otherwise failed to follow its own rules and guidelines with respect to Plaintiff's employee performance evaluation.

135.    AMC provided preferred project work to Plaintiff's similarly situated coworkers to the detriment of Plaintiff.

136.   AMC terminated Plaintiff's employment because of, and in retaliation for, his disclosure of his Disability, and exercise of rights connected thereto, all in violation of the ADA.

137.   Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within the appropriate time period and filed a complaint within 90 days after the date of receipt of a right to sue letter. A copy of Plaintiff's Right to Sue Letter is attached as **Exhibit E.**

138.   As such, this action is timely and Plaintiff has exhausted all administrative prerequisites to filing this action.

139.   As a direct and proximate result of AMC's conduct, Plaintiff has sustained and will continue in the future to sustain damages in the form of lost income, delayed medical treatment, emotional pain, suffering, mental anguish, inconvenience, and loss of enjoyment of life.

140.   AMC's conduct against Plaintiff was intentional and in reckless disregard for his rights to be free from discrimination, retaliation and wrongful termination.

141.   Plaintiff is entitled to all damages recoverable under the ADA, including economic damages, emotional distress, pre and post-judgment interest, punitive damages, attorneys' fees and any other relief the Court deems just and equitable.

## COUNT III – TORTIOUS INTERFERENCE AGAINST DEFENDANT SEDGWICK

142.    Plaintiff hereby incorporates by reference each and every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein

143.    Plaintiff had a contract for and/or expectancy of disability benefits with Defendant AMC, and understood and expected he would receive those benefits if and when he became unable to work due to a disability.

144.    Defendant Sedgwick knew of Plaintiff's contract for and expectancy of disability benefits with Defendant AMC.

145.    Plaintiff suffered from a disability and sought an extended leave of absence under the FMLA from working at Defendant AMC, but after Plaintiff applied for these benefits, Defendant AMC fired Plaintiff and Defendant Sedgwick proceeded to make decisions as to Plaintiff's disability benefits' application with the intention of ensuring non-approval and non-payment of his application despite knowing Plaintiff otherwise timely applied for benefits and met the conditions necessary for receiving such benefits.

146.    Defendant Sedgwick knew of the contractual provisions set forth to guide the decisions made about Plaintiff's application for disability benefits but acted in disregard as to those provisions with knowledge that its actions (and inaction) would deny Plaintiff his short-term disability benefits.

147.    Defendant Sedgwick intentionally procured a breach of Plaintiff's contract for and expectancy of disability benefits with Defendant AMC by choosing not to issue a timely approval or denial, and despite being out of time to do so, then

advanced two inaccurate and specious bases for denying Plaintiff's claim for disability benefits.

148.    Defendant Sedgwick, by denying Plaintiff's disability claim, minimized Defendant AMC's liability under its disability benefits policies.

149.    Defendant Sedgwick administered Defendant AMC's short-term disability benefits policy and Defendant AMC paid Defendant Sedgwick to administer that policy.

150.    On information and belief, Defendant Sedgwick individually benefitted from its cooperation with and aiding of Defendant AMC in denying Plaintiff's application for disability benefits.

151.    Defendant Sedgwick had no justifiable basis for failing to approve Plaintiff's disability benefits and had no justifiable basis for issuing out of time denials against Plaintiff.

152.    As a direct and proximate result of Defendant Sedgwick's conduct, Plaintiff has sustained and will continue in the future to sustain damages in the form of lost income, delayed medical treatment, lost opportunity to obtain long-term disability payments, emotional pain, suffering, mental anguish, inconvenience, and loss of enjoyment of life.

153.    Defendant Sedgwick's conduct against Plaintiff was intentional and in reckless disregard for his rights to be free from interference with his short-term disability benefits.

154.    Plaintiff is entitled to damages, including economic damages, emotional distress damages, pre and post-judgment interest, punitive damages, attorneys' fees and any other relief the Court deems just and equitable.

## COUNT IV – CIVIL CONSPIRACY AGAINST BOTH DEFENDANTS

155.    Plaintiff hereby incorporates by reference each and every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

156.    Defendant Sedgwick was responsible for administering medical leave requests and requests for short term disability benefits for Defendant AMC.

157.    Defendant Sedgwick engaged in activity in compliance with direction or expectations from Defendant AMC to alter Plaintiff's leave application records in order to prevent Plaintiff from receiving FMLA leave.

158.    Defendant Sedgwick engaged in activity in compliance with direction or expectations from Defendant AMC to alter Plaintiff's leave application records in order to make it appear Plaintiff requested FMLA leave after he was terminated and thereby undermine claims by Mr. Karr that his FMLA rights were violated.

159.    Defendant Sedgwick engaged in activity in compliance with direction or expectations from Defendant AMC to deny Plaintiff a timely notice of denial of his short-term disability leave and/or otherwise unlawfully deny Plaintiff's application for short-term disability benefits in breach of the contract entered into by Plaintiff with AMC.

160.    Defendant Sedgwick aided and assisted Defendant AMC in its endeavors to create an electronic record that supported Defendant AMC's illegal,

retaliatory termination of Plaintiff (See Counts I and II) and denial and breach of the short-term disability policy Mr. Karr paid for.

161.    Defendant AMC aided and assisted Defendant Sedgwick in its endeavors to create an electronic record that would support Defendant's illegal, retaliatory termination of Plaintiff (See Counts I and II) and denial and breach of the short-term disability policy Mr. Karr paid for.

162.    Defendant AMC and Defendant Sedgwick coordinated activity to deny Mr. Karr's short-term disability and therefore deny his receipt of long-term disability benefits.

163.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue in the future to sustain damages in the form of lost income, denial or delay of medical treatment, emotional pain, suffering, mental anguish, inconvenience, and loss of enjoyment of life.

164.    Defendants' conduct against Plaintiff was intentional and in reckless disregard for his rights to be free from illegal actions.

165.    Defendants' conduct hindered Plaintiff's ability to procure and receive Long Term Disability benefits for which he had paid a premium during his employment and for which he would have been otherwise eligible to receive in the absence of Defendants' illegal actions.

166.    Plaintiff is entitled to all damages including economic damages, emotional distress, pre and post-judgment interest, punitive damages, attorneys' fees and any other relief the Court deems just and equitable.

## IV.    FRCP 8 Notice of claims under facts stated above.

167.    Incorporating all facts and statements above, Plaintiff states that by listing particular counts of his claim, he is not intending to waive other theories that are, consistent with Federal Law and FRCP 8, cognizable based on the allegations above that support claims for breach of contract/breach of contractual covenants recognized by applicable state law.

WHEREFORE, Plaintiff prays for judgment against Defendants on all Counts above for actual and liquidated damages, compensatory and punitive damages, and all costs, expenses and attorneys' fees incurred herein, for appropriate equitable relief, for interest at the highest lawful rate, and all other relief the Court deems fair and equitable.

## V. DEMAND FOR JURY TRIAL.

Plaintiff hereby demands a trial by jury for the foregoing causes of action.

## VI. DESIGNATION OF PLACE OF TRIAL.

Plaintiff hereby requests that the trial be held at Kansas City, Kansas.

Respectfully submitted,

**REAVEY LAW LLC**

By:  /s/ Kevin C. Koc                    .
        Patrick G. Reavey, KS# 17291
        Kevin Koc KS# 24953
        Livestock Exchange Building
        1600 Genessee, Suite 303
        Kansas City, MO 64102
        Ph: 816.474.6300
        Fax: 816.474.6302
        Email: patrick@reaveylaw.com
        Email: kkoc@reaveylaw.com
        Website: www.reaveylaw.com
        ATTORNEYS FOR PLAINTIFF